# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-0237V

| | |
|---|---|
| LISA KURDZIEL,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br><br>Filed: March 2, 2026 |

*Jessica E. Choper, Britcher Leone & Sergio, L.L.C., Glen Rock, NJ, for Petitioner.*

*Jeremy Mauritzen, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On February 17, 2023, Lisa Kurdziel filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") resulting from adverse effects of an influenza ("flu") vaccination she received on November 24, 2021. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner has preponderantly established 1) a shoulder injury and/or its residual effects lasting for more than six months; and 2) the onset of shoulder pain occurring 48 hours after the at-issue vaccination. In the

---

[1] Because this opinion contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

absence of any other objections from Respondent, and based on an independent review of the evidence, I conclude that Petitioner has established entitlement to compensation for a Table SIRVA, and Petitioner's motion at ECF No 39 is GRANTED.

## I.    Procedural History

After the claim was assigned to SPU in June 2023, Petitioner filed evidence, ECF Nos. 20-29, and Respondent formally opposed any Vaccine Program compensation award, ECF No. 30. Respondent argued that Petitioner had not established the threshold statutory severity requirement or the Table SIRVA requirement of onset within forty-eight (48) hours after the vaccination. Rule 4(c) Report filed Apr. 1, 2024, ECF No. 31 at 9-12. Petitioner filed some additional evidence along with a Motion for Judgment on the Administrative Record on Sept. 19, 2024, ECF No. 39 (hereinafter "Brief"); *see also* Response filed Nov. 1, 2024, ECF No. 40; Reply filed Nov. 19, 2024, ECF No. 42. Petitioner's Program eligibility and her entitlement for a Table SIRVA are now ripe for adjudication.[3]

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1).

As a threshold matter for Vaccine Program eligibility, a potential petitioner must establish that he or she "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine". Section 11(c)(1)(D)(i)[4]; *see also Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted). "[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged

---

[3] Petitioner also requested permission "to file expert reports" prior to briefing the disputed issues. ECF No. 32, 36. I advised that no experts were authorized while the case was in SPU. Order on June 5, 2024 (NON-PDF). Petitioner acceded to briefing the disputed issues, while maintaining her request to retain experts in support of the severity and onset allegations "[i]n the event the Court is inclined" to decide such issues against her. Brief at 21.

[4] Section 11(c)(1)(D) presents two alternative grounds for eligibility to compensation if a petitioner does not meet the six months threshold: (ii) death from the vaccine, and (iii) inpatient hospitalization and surgical intervention. Neither alternative is alleged or implicated in this claim.

injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . .  does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

In addition to requirements concerning the vaccination received, and the lack of other award or settlement,[5] a petitioner must establish that he or she either suffered an injury meeting the Table criteria, in which case causation is presumed, or he or she suffered an injury shown to be caused-in-fact by the vaccination received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time frame;

---

[5] In summary, a petitioner must establish that he or she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; and he or she has not filed a civil suit or collected an award or settlement for the injury. *See* § 11(c)(1)(A)(B), (E).

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of

4

the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

I am resolving the parties' current disputes on the written record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide many matters on the papers where, in the exercise of their discretion, they conclude that doing so will properly and fairly resolve the issue. *See* 42 U.S.C. § 12(d)(2)(D); Vaccine Rule 8(d). Indeed, the decision to rule on the record in lieu of a hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020); *Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided cases on the papers in lieu of hearing and those decisions were upheld).

## III.    Findings of Fact and Conclusions of Law

The record preponderantly supports findings that 1) the alleged injury and/or its residual effects occurred for at least six months, and 2) that the injury's onset was within 48 hours after the November 24, 2021 vaccination. I reach these conclusions after a complete review of the record to include all medical records, testimonial evidence, Respondent's Rule 4(c) Report, and both parties' briefing. I highlight the following:

- **Medical Records.** Petitioner was born in 1981. She regularly ran, biked, and swam – sometimes even in competitive triathlons or "Iron Man" events. *See e.g.*, Ex. 3 at 23-24 (October 12, 2021 primary care record, reporting that Petitioner was "in the best shape of her life"). There is not preponderant evidence of prior right shoulder pain or dysfunction.[6]

---

[6] Respondent notes that Petitioner's active lifestyle was connected with "orthopedic issues." Response at 2 and n.1. Many of the cited medical records concern Petitioner's *legs. Id.*, citing Ex. 3 at 61 (diagnosing Petitioner with a "[l]ikely stress fracture given recent intensity of running"); *id.* at 58 (describing "chronic right knee pain with recurrent effusion requiring multiple injections"); Ex. 5 at 55-333 (physical therapy for lower extremities). Certain other records contain isolated references to possible right shoulder issues, but without confirming any actual intervention or treatment in the three years before the November 24, 2021 vaccination. *See* Ex. 3 at 63 (August *2013* primary care record suggesting prior "surgical history: knee and

- On November 24, 2021 at a CVS pharmacy, Petitioner received the at-issue flu vaccine in her right arm, as well as a Moderna COVID-19 vaccine in her left arm. Ex. 20 at 2.[7]

- Eight days post-vaccination, on December 2, 2021, Petitioner received a COVID-19 PCR test at the office of her established primary care provider ("PCP"). Ex. 3 at 19-20. A registered nurse conducted the PCR test, but did not record any other complaints, physical examination, diagnosis, or treatment. *Id.* at 20.

- Twenty (20) days post-vaccination, on December 14, 2021, Petitioner saw a primary care physician's assistant ("PA") for a chief complaint of right shoulder pain. Ex. 3 at 16. Petitioner was concerned that on November 24th, the pharmacist had applied too much pressure upon administering her vaccines. *Id.* Afterwards, Petitioner had experienced left-sided pain for 1 week (now "resolved"), and "persisten[t]" right-sided pain, plus reduced range of motion ("ROM"), with her symptoms worst in the morning. *Id.* A physical examination confirmed that the right shoulder had "significantly reduced active ROM [range of motion] with abduction, flexion" with normal findings on the left side. *Id.* at 17. The PA "suspected SIRVA," for which he provided a short course of NSAIDs as well as sports medicine evaluations and formal PT. *Id.*

- At a December 15, 2021 sports medicine initial evaluation, Petitioner again reported that her right-sided flu shot had caused persistent pain. Ex. 3 at 14. Petitioner added that during a work trip overseas[8] with up to 18-hour days, she "didn't notice pain in Rt arm at first, but then [it] started getting worse," specifically making it hard to pull luggage and put on a sports bra. *Id.* Petitioner had been taking Advil 400-600mg each morning to try to manage the pain. *Id.* On exam, the right shoulder displayed significantly decreased active ROM in all planes limited by 25% due to pain; full passive ROM with mild pain; and positive Hawkins and empty-can tests. *Id.* at 14-15. An ultrasound of the right shoulder was suggestive of subacromial bursitis and impingement, which the sports medicine physician believed was "likely related to SIRVA from administration of the flu vaccine too high." *Id.* at 15. To alleviate Petitioner's "significant discomfort," he administered a

---

shoulder arthroscopy"), *id.* at 39-40, 29-31, 67 (later primary care records with the same notation); Ex. 5 at 238 (2019 report of "return onset" of right shoulder pain without any corresponding diagnosis or treatment, during a physical therapy course focused on the lower extremities); *id.* at 159 (2020 physical therapy diagnosis of "pain in right shoulder" on "missed appointment" form).

[7] Petitioner does not allege injury from the Moderna COVID-19 vaccine administered in her left arm, and COVID-19 vaccines are not covered in the Vaccine Program. *See generally* Petition; Response at 3, n. 1.

[8] Petitioner states that she was employed as a community and partnerships manager for the non-profit arm of a large corporation. She typically worked from home but executed "high-level leadership gatherings" several times a year at various locations. Ex. 9 at ¶ 5.

subacromial steroid injection; prescribed Voltaren; and recommended rest from swimming for at least two weeks. *Id.* The sports medicine physician instructed Petitioner to follow up in two to three weeks to reassess the injury and discuss a return to swimming as part of her Ironman training. *Id.*

- At the January 3, 2022 sports medicine follow-up,[9] Petitioner reported that her right shoulder had "significant ongoing pain" during the week of Christmas and had kept her from traveling home over the holidays, but she had started feeling much better in the past week. Ex. 3 at 11. Petitioner's biggest concerns were limited ROM; pain with certain motions; and loss of function especially being unable to swim, as she was scheduled to attempt an Ironman Texas competition in April 2022. *Id.* at 12. The sports medicine physician recorded that Petitioner's shoulder was 50% improved overall, but it still displayed slight ROM and strength deficits. *Id.* at 13. The physician recommended "aggressive PT" and "feeling at least 90% improved" before returning to swimming, hopefully in another 2+ weeks. *Id.* An earlier, premature return to swimming "could potentially cause more harm" or slow her progress. *Id.* Additionally Petitioner would switch from Voltaren orally to a topical gel; apply heat and ice; and consider massage and/or acupuncture treatments. *Id.* There are no further records from the sports medicine practice.

- One day later, on January 4, 2022, Petitioner obtained an orthopedics initial evaluation for treatment of "right shoulder pain since receiving the flu shot on 11/24/2021," now improved "about 50%." Ex. 4 at 5. Petitioner reported training for an upcoming Ironman competition, except for the swimming component. *Id.*[10] After reviewing Petitioner's existing medical records and more general information about impingement syndrome and SIRVA, the orthopedist ordered an MRI of the right shoulder to rule out a full-thickness rotator cuff tear. Ex. 4 at 6; *see also* Ex. 7 at 2-3 (January 21, 2022 MRI report indicative of only marrow signal abnormality in the posterior greater tuberosity, and edema or contusion in the supraspinatus tendon).

---

[9] This sports medicine record incorrectly states that Petitioner's symptoms started after a Moderna COVID-19 vaccine. Ex. 3 at 11. As noted above, on November 24, 2021 Petitioner had received a non-covered Moderna COVID-19 vaccine in her non-injured left arm, and a covered flu vaccine in her subsequently injured right arm. Ex. 20 at 2.

[10] This January 4, 2022 orthopedics record provides that swimming had been paused by Petitioner's *PCP*. Ex. 4 at 5. As noted above, swimming had actually been paused by a sports medicine physician.

Additionally the January 4, 2022 orthopedics record provides that Petitioner was already "going to physical therapy as part of her training" and would "continue" PT for her shoulder. Ex. 4 at 5, 6. But the available evidence indicates that Petitioner only started PT for her shoulder two days later. *See e.g.*, Ex. 5 at 51-54.

- At the January 6, 2022 PT initial evaluation for her right shoulder, Petitioner reported a vaccine injury, specific onset date of "11/25/2021," and pain ranging from 6-10/10, particularly while holding objects and reaching overhead. Ex. 5 at 51. Her disability score was 55/100. *Id.* The physical exam found pain-protective behavior ("holding shoulder close to body to avoid pain, decr[eased] rib cage and arm motion in gait"); decreased ROM; decreased strength; positive impingement signs; and pain on flexion, external rotation, and palpation of the shoulder. *Id.* at 51-53. Suspecting adhesive capsulitis, the therapist started formal treatment of the right shoulder twice a week. *Id.* at 53.

- A February 15, 2022 orthopedics record reflects improved, but ongoing right shoulder pain and decreased ROM. Ex. 4 at 3. Petitioner reported ongoing use of Voltaren topical gel, activity modification, and an anti-inflammatory diet (in addition to her ongoing PT sessions). *Id.* Because Petitioner had "significant concerns about maximizing her chances to return for her Ironman scheduled in April," she underwent another subacromial steroid injection. *Id.*

- On March 29, 2022, Petitioner reported that the last injection had significantly relieved her right shoulder pain. Ex. 4 at 2. Petitioner had "no intentions of slowing her training routine and wishe[d] to push through" to the upcoming Ironman competition. *Id.*

- On April 14, 2022, Petitioner attended her 18th formal PT session. Ex. 6 at 7. Her right shoulder pain ranged from 3-5/10 and was "ach[y]." *Id.* Her disability score was 20.45/100. *Id.* at 8. Her strength and scapular motion were "improved with soreness at end range of motion." *Id.* She had unmet long-term goals relating to lifting and carrying items weighing 10 pounds or more; reaching overhead; and doffing her shirt. *Id.* Petitioner was encouraged to continue formal PT. *Id.* But on that same date (April 14, 2022), the physical therapist reported that Petitioner had been unable to use all of her authorized PT sessions before the expiration date, and she needed a 30-day extension of coverage. Ex. 6 at 6. It is unclear whether or not Petitioner's health insurance plan approved this request.

- An April 19, 2022 orthopedics record provides that since the last injection, Petitioner's right shoulder "pain and discomfort ha[d] returned." Ex. 4 at 1. A physical examination found pain with overhead ROM; positive Neers and Hawkins signs; and pain at the acromioclavicular joint and on cross arm adduction. *Id.* The orthopedist injected Toradol (ketorolac, an NSAID) to the right subacromial space, as previously planned, to help Petitioner attempt the Ironman competition later that week. Ex. 4 at 1, 2.

- The next evidence is from over four months later, on August 26, 2022, when Petitioner attended a primary care appointment for concerns including contracting "COVID-19 in April," and possibly again in July. Ex. 3 at 6. Petitioner received a flu vaccine in an unspecified arm. *Id.* at 8. This primary care record does not specifically address the presence or absence of a shoulder injury.[11] Neither does the record document any knee or hip issues, e.g., iliotibial ("IT") band syndrome – but the primary care PA referred that apparent issue to PT on or by September 8, 2022, *see* Ex. 6 at 41-43.

- On September 8, 2022, Petitioner began formal PT for iliotibial ("IT") band syndrome. Ex. 6 at 44-46. On September 30, 2022, the fourth PT session and progress note focused on IT band syndrome, but also noted Petitioner's report of "remnants of R shoulder pain (SIRVA 12/21),"[12] with the pain ranging from 3-5/10 and characterized as "dull/achy." *Id.* at 19.

- From October 2022 through at least June 2023, the physical therapist apparently treated Petitioner's alleged SIRVA as a "secondary issue," without a full evaluation or formal diagnosis (in contrast to the ongoing, primary issue of IT band syndrome). *See, e.g.*, Ex. 6 at 13, 11; Ex. 10 at 52, 49, 40, 38, 32, 23, 20, 18, 13, 5, 8, 2; Ex. 13 at 19, 16, 13, 4, 1 (PT sessions with manual therapy addressing "shoulder mobs and A/PROM x5'") (organized chronologically).

- On August 21, 2023, Petitioner attended a telehealth appointment with her primary care practice. Ex. 14 at 5. Petitioner reported that her regular provider at the practice (a physician's assistant) was out on maternity leave. *Id.* Petitioner reported that she was "pretty continuously in PT for SIRVA" and she needed a renewed prescription for PT in advance of an appointment scheduled for that afternoon. *Id.* The primary care provider recorded entering a referral to PT. *Id.*

- Later that same day, Petitioner and her regular physical therapist met for a formal "initial examination" of a current right shoulder complaint. Ex. 13 at 62. Petitioner reported that the injury had began with her 2021 flu vaccination, and that "Over the past few months, sx have been manageable but this month, symptoms and AROM limitations have resurfaced…" *Id.* Petitioner reported pain ranging from 6-8/10, particularly upon reaching overhead; donning/doffing clothing; and holding objects

---

[11] Respondent notes that the August 26, 2022 primary care record's "Social History" section states: "Exercise – training for 70.3." Response at 6, citing Ex. 3 at 7. However, the same notation appears in at least two *earlier* primary care records. Ex. 3 at 29-31 (May 7, 2021); *id.* at 39-41 (January 10, 2020). It is unclear whether this notation was merely carried forward, versus actually entered at the August 24, 2022 appointment.

[12] As noted above, Petitioner alleges SIRVA from a flu vaccine received on *November* 24, 2021.

heavier than ten pounds. *Id.*[13] The shoulder's disability score was 45.45/100. *Id.* Petitioner displayed pain-protective behavior ("guarding"); limitations with active ROM and strength; positive capsular pattern, painful arc, and Hornblower's tests; and tenderness to palpation; but no radicular or neurological symptoms. *Id.* at 62-63. The physical therapist assessed her symptoms as "consistent with adhesive capsulitis (SIRVA) diagnosis," and planned a course of formal treatment. *Id.* at 63-64.

- Petitioner attended a total of eight PT sessions focused on her shoulder that fall, concluding on October 2, 2023. *Id.* at 31-64. The final progress note reflects a slightly decreased disability score of 38.64 and some objective improvements (e.g., in active shoulder flexion and reaching overhead). *Id.* at 38. The therapist recommended more formal sessions, *id.*, but none are in evidence.

- Finally, at a July 25, 2024 orthopedics follow-up appointment, Petitioner sought reevaluation of a reportedly chronic right shoulder injury. Ex. 22 at 3. Petitioner reported that she had been unable to compete in the April 2022 Ironman event "secondary to a positive COVID diagnosis." *Id.* Afterwards, she had been able to participation in "half" Ironman events, but at her previous level of competition. *Id.* She reported "notable," "on and off" right shoulder pain, for which she obtained formal PT when possible (while balancing insurance and financial limitations) in addition to a home exercise program. *Id.* On exam, the right shoulder had painful ROM, positive Neers and Hawkins signs, and tenderness. *Id.* The orthopedist discussed *his* "experience with SIRVA" and current treatment options for Petitioner, then administered a subacromial steroid injection. *Id.* at 4.

- **Witness Statements.**[14] Regarding onset, Petitioner recalled that after her November 2021 vaccinations, she "immediately noticed discomfort and lack of mobility in both arms," which persisted on the right side (corresponding to the flu vaccination). Ex. 9 at ¶ 4. She recalls "constant" right shoulder pain and decreased ROM throughout a work trip occurring the first week of December 2021. *Id.* at ¶¶ 6-8.

- Petitioner's mother recalls Petitioner's multiple complaints of right shoulder pain after the November 2021 flu vaccination, first in telephone conversations. Ex. 21 at ¶ 3. The mother personally observed Petitioner's "tremendous" pain and

---

[13] The August 21, 2023 PT record incorrectly states that an *orthopedist* had recently recommended continuation of PT. Ex. 13 at 62. As noted *supra*, Petitioner had actually seen a primary care provider earlier that day. Ex. 14 at 5.

[14] The statements at Exs. 9, 11-12, 21, 23, 24 are improperly labeled as affidavits – because they are not notarized. However, the statements are certified as true and correct subject to punishment. Ex. 21 at ¶ 12. *See* 28 U.S.C.A. § 1746 (providing that such a statement may be given like force and effect as an affidavit).

limitations upon handing off her dog, just before her departure for the December 2021 work trip. *Id.* at ¶¶ 5-6.

- Petitioner also maintains that her right shoulder injury persisted for over six months. She acknowledges being a "serious and competitive athlete" and wanting to push through competing in the April 2022 Ironman event. Ex. 9 at ¶ 17. In pursuit of that goal, she received formal PT; home therapies; and "slowly, painfully, push[ed] [her]self back into the pool… about two months before [her] scheduled full Ironman." *Id.* at ¶¶ 17-18 (describing being unable to extend her right arm while swimming; using her left arm as much as possible; and wearing fins on her feet). Petitioner does not address whether she actually attempted or completed the April 2022 Ironman, but she describes "revamp[ing] her overall approach to competitions, instead selecting "run, bike, run" races throughout 2022. *Id.* at ¶ 20. By 2023, Petitioner was working out in the pool 3-4 times a week, with pain medication in advance and hat applied to the shoulder afterwards. Ex. 16 at ¶ 3. She initially returned to races featuring "easier swims (down rive or non-ocean)," but reported ongoing shoulder pain and reduced ROM. *Id.* at ¶ 4. As of September 2024, Petitioner alleges chronic shoulder pain and limitations which continue to significantly disrupt her competitions (e.g., 70.3, or "Half Ironman" events) and other aspects of her life. *See e.g.*, Ex. 16 at ¶¶ 24-30.

- Regarding her treatment gap after April 2022, Petitioner contends that her health insurance coverage for PT addressing her shoulder ran out. Ex. 23 at ¶ 5. She could not afford to pay out of pocket for formal PT, opting instead for home exercises. *Id.* Petitioner also states that the orthopedist's injections, including on April 19, 2022, temporarily relieved her shoulder pain but only for a few weeks' time. *Id.* at ¶ 16. She did not return to the orthopedist after April 19, 2022, because he did not offer any further treatment options, other than PT and non-prescription pain medications. *Id.* at ¶ 17.Petitioner avers that she resumed formal PT for knee problems in September 2022, and she took that opportunity to mention her continued right shoulder pain even before getting insurance authorization specifically to address the shoulder in August 2023. *Id.* at ¶¶ 19-20.

- In a May 29, 2024 letter "to whom it may concern," physical therapist Samantha Jacobsen describes caring for Petitioner "since she was diagnosed with SIRVA… a condition that raised following vaccine administration, leading to pain and impaired range of motion in the affected shoulder." Ex. 24. The therapist stresses that Petitioner had not suffered any pre-vaccination shoulder injury, or any apparent "sports-related or separate shoulder injury that occurred after the vaccine injury." *Id.* The therapist writes that "despite our diligent work," Petitioner continues to suffer considerable pain and reduced ROM. *Id.*

11

### A. Severity

The record preponderantly supports a finding that Petitioner's right shoulder injury (allegedly stemming from her November 24, 2021 vaccination, and undisputedly present by her December 14, 2021 primary care evaluation) lasted for at least six months, under the meaning of Section 11(c)(1)(D)(i).

Respondent's severity objection is not unreasonable, considering Petitioner's well-documented desire to return to strenuous competitions, and her discontinuation of formal treatment for an extended period after April 19, 2022. Response at 8-9. However, at that point the injury had already been present for four to five months (depending on onset, which is assessed further below), which speaks to some degree of initial severity.

Moreover, the medical records never predict or state that the shoulder injury resolved, but instead indicate that Petitioner wished to "push through" the pain and attempt the Ironman (Ex. 4 at 2). On April 19, 2022, the orthopedist administered a Toradol injection to Petitioner's shoulder to that end (Ex. 4 at 1). The available evidence also suggests that Petitioner had been returning to her workouts gradually, and with modifications (*see e.g.*, Ex. 9 at ¶¶ 17-18).

Petitioner later claimed that she was unable to attempt the Ironman because of an intervening COVID-19 infection (Ex. 3 at 6; Ex. 22 at 3). Finally, Petitioner's discontinuation of formal PT for her shoulder after April 14, 2022, was more likely than not explained by insurance limits (*see e.g.*, Ex. 6 at 6-8 (April 2022 records reflecting that Petitioner had not achieved her goals, and the PT coverage period had expired); Ex. 6 at 13 (October 2022 start of PT sessions featuring "shoulder mobs and A/PROM"); Ex. 13 at 62-64 (August 2023 PT formal evaluation for shoulder injury since the vaccination nearly two years earlier); Ex. 24 (therapist's letter endorsing a continuous shoulder injury)).

Respondent contends that this case strongly resembles a matter in which I concluded that a different petitioner had not established severity. Response at 9-10, citing *Han v. Sec'y of Health & Hum. Servs.*, No. 20-0817V, 2024 WL 1235405 (Fed. Cl. Spec. Mstr. Feb. 21, 2024). Respondent is correct that both cases feature generally healthy, physically active individuals with gaps in shoulder treatment. However, as Petitioner notes (Reply at 2), *Han* reflected an earlier stop to treatment (just two months and 11 days post-vaccination, compared to nearly five months post-vaccination in this case); documentation of normal ROM and strength (compared to ongoing limitations here); no steroids or NSAID injections; and greater intervening medical care for other concerns. *Han*, 2024 WL 1235405 at *2-11. Accordingly, *Han* is distinguishable. Reply at 2.

For all of those reasons, Petitioner has managed to establish that her post-vaccination shoulder injury persisted for over six months. (At the same time, Petitioner's treatment gaps – and her resumption of physical exercise and competitions, even if involving modifications for her shoulder injury, will be relevant to any assessment of an appropriate damages award.)

### B. Onset

Respondent argues that the earliest medical record histories of Petitioner's shoulder injury are too vague to establish onset within 48 hours after the November 24, 2021 vaccination. Response at 12. But the December 14, 2021 record describes post-vaccination "arm pain bilaterally for 1 week," after which the "LEFT arm pain resolved" but "RIGHT arm pain has persisted." Ex. 3 at 16 (emphasizing that the right arm received the flu vaccine at issue). This record supports a finding of right shoulder pain beginning shortly after the vaccination and persisting for several weeks, even if it does not pinpoint the onset date.

Respondent also emphasizes the December 15, 2021 sports medicine notation that Petitioner "didn't notice pain in Rt arm at first" during her December 2021 Response at 12, citing Ex. 3 at 14. But this same record reflects that the pain had "persisted" since the vaccination. *Id.*

Many other medical records support onset as occurring within the Table timeframe. *See e.g.,* Ex. 4 at 5 ("right shoulder pain since receiving the flu shot on 11/24/2021"); Ex. 5 at 51 (onset date of "11/25/2021"). Finally, Petitioner's mother personally observed her shoulder injury as being present *before* the work trip – which evidence further supports Petitioner's onset allegation, and which Respondent has not acknowledged. *See* Response at 7-8, 12-13 (not addressing the mother's sworn statement). Through this evidence and Petitioner's own supplemental statements, she has preponderantly established a Table SIRVA onset.

### IV.    Remaining Table SIRVA QAI Criteria and Statutory Requirements

Petitioner's success in meeting the remaining QAI requirements is not disputed, and I also find that they have been preponderantly satisfied. The record does not reflect any history of right shoulder pain or dysfunction (*see* supra 5 and n. 6), symptoms extending beyond the right shoulder; or potential alternative explanations for the alleged SIRVA. Petitioner was also documented to have reduced ROM (*see e.g.,* Ex. 3 at 14-15; Ex. 5 at 51-53).

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States (Ex. 20 at 2). And she states that she has not pursued or received any other compensation for this injury (Ex. 9 at ¶ 23). Thus, she is entitled to Vaccine Program compensation.

### Conclusion and Damages Order

For the foregoing reasons, Petitioner is entitled to compensation for a right-sided SIRVA. **Thus, this case is now in the damages phase**.

As stated above (in Section III.A), Petitioner has established that her SIRVA is sufficiently severe to warrant Vaccine Program compensation. But at the same time, any damages award will need to consider her return to physical exercise and competitive events even with modifications to her shoulder; as well as her treatment gaps, and fairly conservative treatment overall. The parties should attempt to agree on an appropriate damages award – which will likely center on pain and suffering, and potentially out-of-pocket medical expenses. The case does not appear to involve a lost earnings claim, workers' compensation, or a Medicaid lien.

**Within 60 days, by no later than Friday, May 1, 2026, Petitioner shall file a Status Report updating me on the parties' progress toward informally resolving the issue of damages.** The Status Report shall specifically state the date by which Petitioner provided or intends to provide a demand for damages to Respondent. Additionally, Petitioner shall confirm whether any Medicaid lien exists, and if so, state the date by which Petitioner anticipates providing Respondent a letter from the appropriate state agency verifying the amount of the lien. As always, Petitioner should continue to file any updated medical records as they become available.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

14